10 N.Y.3d 370 (2008)
887 N.E.2d 1132
858 N.Y.S.2d 74
THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v.
BRETT CABRERA, Appellant.
Court of Appeals of the State of New York.
Argued March 13, 2008.
Decided May 1, 2008.
*371 Orseck Law Offices PLLC, Liberty (Gerald Orseck of counsel), for appellant.
Stephen F. Lungen, District Attorney, Monticello (Bonnie M. *372 Mitzner of counsel), for respondent.
Chief Judge KAYE and Judges PIGOTT and JONES concur with Judge READ; Judge GRAFFEO dissents in a separate opinion in which Judges CIPARICK and SMITH concur.

OPINION OF THE COURT
READ, J.
Late in the afternoon on a bright, summery June day in 2004, a group of Sullivan County youths set out for a local lake to go swimming. They piled into two vehicles to make the trip. One was operated by 19-year-old Monica Mendoza, with her younger sister as a passenger; the other, by defendant Brett Cabrera, a 17 year old with a junior "class DJ" license. Cabrera was driving his parents' 2004 Mercury Mountaineer, a midsized SUV; the Mountaineer had no mechanical defects and nearly new tires. Cabrera was transporting four teenage passengers; none were family members.
Cabrera's junior license imposed several restrictions: as relevant here, the holder of a class DJ license, which "shall automatically become a [normal, unrestricted noncommercial] license when the holder becomes eighteen years of age" (Vehicle and Traffic Law § 501 [2] [vi] [emphasis added]), may not operate a vehicle with more than two passengers under 21 years of age who are not members of the junior licensee's immediate family, and must ensure that all passengers have buckled their seat belts (see Vehicle and Traffic Law § 501-b [2]). But on this trip to the lake, none of Cabrera's four passengersa 14 year old, a 15 year old, a 17 year old and an 18 year oldwore a seat belt. Cabrera himself did.
*373 Because she did not know the way to the lake, Monica followed Cabrera. They were driving "at the same speed" and it was, in Monica's estimation, "a reasonable speed," perhaps 40 miles per hour. She also, however, stated that her mind was so "blurry" that she "really never knew how fast [they] were going."
Cabrera and Monica eventually turned onto Sackett Lake Road, where the posted speed limit was 55 miles per hour. At a point where the roadway curved to the right, Monica "slowed down" her car because she was "not always used to driving" that type of hilly, winding road. When she reduced her speed, Cabrera "just kept on the same speed[,] so he pulled away ... from [her] a little ... [b]ecause [she] slowed down." But "by the time [Monica] was getting into" a second curve (presumably the curve to the left before the accident scene), she "just saw the back of the car [Cabrera was driving] ... and then [she] lost" sight of it "for ... a second or two and then when [she] saw the car again[,] it was just ... losing control ... going to the side of the road" before crashing. Three of the passengers in the Cabrera vehicle died in this accident, and one was critically injured. Cabrera suffered noncritical injuries. He tested free of drugs and alcohol.
Santiago Mendoza, the only surviving passenger in Cabrera's vehicle, testified at trial about "[w]hat was going on in [Cabrera's] car" leading up to the accident. The passengers were talking amongst themselves and listening to rap music; they were not interacting with Cabrera. When asked what Cabrera was doing, Santiago answered simply: "Driving." Asked by the prosecutor if "there [was] any conversation in the car about how fast or speed or where your sisters were,[[1]] or anything about that," he answered "No." Indeed, the first time Santiago noticed anything distinctive about Cabrera's driving was when he "felt the car lose control" and "felt the back end slide ... [and] hit the dirt on the opposite side of the road."
According to Deputy Sheriff Amanda Cox, the first quarter of a mile or so on the stretch of Sackett Lake Road leading to the accident scene is flat or uphill; the road crests and goes down along a straightaway past a turnoff. The road then goes up slightly before bending to the left and sloping downhill. At the bottom of this descent is a dip in the road before it starts back *374 uphill and slants to the right; the accident occurred "right at the dip."
There is a "40 mph curve" sign near the point at which Sackett Lake Road veers left into the downhill slope. Deputy Cox authored a police accident report concluding that the operator of vehicle one (the SUV driven by Cabrera) "while traveling westbound on Sackett Lake Road at a rate of speed unsatisfactory for the roadway failed to negotiate a curve. Vehicle One then crossed over the double yellow line into the eastbound lane" and "went off the eastbound shoulder striking a ... utility pole ... [and] a tree and coming to rest on the driver side of the vehicle." When Cabrera's vehicle went off the left-hand side of the road, it slid down a 25-to-30-foot embankment. Deputy Cox knew of other accidents at this location. Similarly, Detective Don Starner had "investigated several accidents ... most of them caused by either speed and or alcohol" on Sackett Lake Road near the crash site.
Trooper Shane Conklin, a collision reconstructionist for the New York State Police, "observed two tire marks that [began] in the westbound lane to the right of the center line and ... progressed in a westerly direction through the westbound lane back across the double solid line into the eastbound lane and ended on the edge of the asphalt," at which point the rear of the Cabrera vehicle fell down the embankment on the left side of the road (followed by the rest of the vehicle). The distance from the point at which the tire marks started until the point at which the vehicle left the road was approximately 230 feet. There were other tire marks in the roadway that were not from Cabrera's vehicle.
According to Trooper Conklin, the tire marks from the Cabrera vehicle were made by "critical speed yaw." This occurs when a vehicle begins spinning on its central axis and the tires are "side slipping" while rotating; in other words, the tire marks were caused by the vehicle as it spun out of control, not by skidding upon braking. Using the yaw marks, Trooper Conklin calculated a speed of 70-72 miles per hour upon entry into the critical speed yaw and opined that the left side of Cabrera's vehicle had crossed the double-yellow center line by that point.
Trooper Conklin ultimately concluded that Cabrera's "vehicle was attempting to negotiate the curve at a speed that was too great to be negotiated ... [a]nd the speed was between 70 and 72 miles an hour," causing the SUV to enter into critical speed *375 yaw. He observed that once a critical speed yaw is entered, "it is very difficult to bring the car back under control."
Cabrera was charged with three counts of criminally negligent homicide (Penal Law § 125.10), one count of assault in the third degree (Penal Law § 120.00 [3]), reckless driving (Vehicle and Traffic Law § 1212), and various traffic infractions. At his subsequent jury trial, he sought to dismiss the homicide and assault charges on the ground that his actions, as proved by the People, were insufficient as a matter of law to establish criminal negligence. The judge was unpersuaded. Cabrera also was unable to convince the trial judge to advise the jury that excessive speed is by itself not enough to support criminal negligence, and that junior license violations are not evidence of criminal negligence. Consequently, he objected to the judge's main and supplemental jury charges.
The jury convicted Cabrera on all counts and the trial judge sentenced him to the maximum term allowed by statutean aggregate term of 11/3 to 4 years in prisonand fined him $800. Cabrera was then remanded to the custody of the New York State Department of Correctional Services, and served out his sentence in a maximum security prison.
The Appellate Division, three-two, affirmed the conviction, with one of the two dissenting justices granting Cabrera leave to appeal to us. Cabrera advances two arguments on appeal: that the evidence adduced at trial was insufficient as a matter of law to sustain his convictions for criminally negligent homicide and third-degree assault; and, in the alternative, that he is entitled to a new trial because the trial judge's instructions were erroneous.
"A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person" (Penal Law § 125.10). Similarly, a person is guilty of third-degree assault when "[w]ith criminal negligence, he causes physical injury to another person by means of ... a dangerous instrument" (Penal Law § 120.00 [3]). Since an automobile is concededly "a dangerous instrument" for purposes of Penal Law § 120.00 (3), and Cabrera "cause[d] the death of" three of his passengers insofar as he may have been criminally negligent, the parties contest only whether he acted with the requisite mens rea. Under section 15.05 (4) of the Penal Law,
"[a] person acts with criminal negligence with respect to a result ... when he fails to perceive a *376 substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."
We have examined section 15.05 (4) in detail on numerous occasions, most recently in People v Conway (6 NY3d 869 [2006]). There, we explained that
"the carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and that the carelessness must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong. Moreover, criminal negligence requires a defendant to have engaged in some blameworthy conduct creating or contributing to a substantial and unjustifiable risk of a proscribed result; nonperception of a risk, even if [the proscribed result occurs], is not enough" (id. at 872 [internal quotation marks and citations omitted; emphasis added]).
Cabrera protests that excessive speed is never enough to make out a case of criminally negligent homicide, citing People v Bearden (290 NY 478 [1943]) and People v Eckert (2 NY2d 126 [1956]), two decades-old cases decided under Penal Law § 1053a, a predecessor statute to Penal Law § 125.10. While Cabrera reads Bearden and Eckert as, in effect, establishing a per se rule, our more recent cases take a slightly different tack.
In 1990, for example, we decided two companion cases involving criminally negligent homicide arising out of automobile accidents: People v Boutin (75 NY2d 692 [1990]) and People v Paul V.S. (75 NY2d 944 [1990]). In Boutin, we reversed a conviction for criminally negligent homicide where the defendanttraveling near, and possibly under, the speed limitstruck a marked police car stopped in the right-hand travel lane of Interstate 87 on a rainy, foggy night. In Paul V.S., decided in a memorandum the same day as Boutin, we affirmed a conviction for criminally negligent homicide where the defendant was traveling 90 miles per hour in a 55 miles per hour "radar zone," accelerated after being warned by his passenger to slow down, continued past a line of cars that had been stopped by police, and ultimately struck and killed a state trooper attempting to direct him off the highway.
*377 When discussing our precedents in Boutin, we observed that the common thread was the "creation," rather than the "nonperception," of risk. Boutin implicated noncriminal "risk nonperception" because the defendant had simply "fail[ed] to see the vehicle stopped in the lane ahead of him[,] result[ing] in the fatal accident" (75 NY2d at 697). This was to be distinguished from cases where there was "criminally culpable risk-creating conducte.g., dangerous speeding, racing, failure to obey traffic signals, or any other misconduct that created or contributed to a `substantial and unjustifiable' risk of death" (id. at 697-698 [citations omitted and emphasis added]).
In short, it takes some additional affirmative act by the defendant to transform "speeding" into "dangerous speeding"; conduct by which the defendant exhibits the kind of "serious[ly] blameworth[y]" carelessness whose "seriousness would be apparent to anyone who shares the community's general sense of right and wrong" (Boutin, 75 NY2d at 696 [citations omitted]). Thus, in the cases where we have considered the evidence sufficient to establish criminally negligent homicide, the defendant has engaged in some other "risk-creating" behavior in addition to driving faster than the posted speed limit (compare People v Haney, 30 NY2d 328 [1972] [defendant was speeding on city street and failed to stop at red light before killing pedestrian crossing street with green light in her favor]; People v Soto, 44 NY2d 683 [1978] [defendant, who was speeding and drag racing on city street, struck and killed driver stopped at red light]; People v Ricardo B., 73 NY2d 228 [1989] [defendant was drag racing at between 70 and 90 miles per hour on a busy metropolitan street, ran a red light and struck vehicle crossing intersection with light in its favor]; People v Loughlin, 76 NY2d 804, 807 [1990] [intoxicated defendant was speeding on obstructed street under construction in residential neighborhood in Queens]; People v Maher, 79 NY2d 978, 980 [1992] [intoxicated defendant drove at speeds of 50 to 100 miles per hour in 35 miles per hour zone in Manhattan, disobeying several traffic signals]; People v Harris, 81 NY2d 850, 851-852 [1993] ["defendant, while legally intoxicated, drove his motor vehicle in the dark of night from a public highway into an unfamiliar farmer's field, accelerated at times to a speed approximating 50 miles per hour, intermittently operated the vehicle without headlights, and suddenly and forcefully drove through a hedgerow of small trees and shrubs, not knowing what obstacles and dangers lurked on the other side"]; People v Ladd, 89 NY2d 893, 894-895 *378 [1996] [intoxicated defendant driving on wrong side of a foggy road at 4:30 A.M.], with People v Perry, 123 AD2d 492, 493 [4th Dept 1986], affd 70 NY2d 626 [1987] [no criminal negligence present where defendant was driving approximately 80 miles per hour in a 55 miles per hour zone "on a rural road, on a dark night," struck a utility pole, and killed two passengers; defendant's "conduct ... d(id) not constitute a gross deviation from the ordinary standard of care held by those who share the community's general sense of right and wrong" (citations omitted)]).
The question on this appeal is therefore whether, when viewed in the light most favorable to the People, the evidence adduced at trial showed that Cabrera's conduct constituted "not only a failure to perceive a risk of death, but also some serious blameworthiness in the conduct that caused it" (Boutin, 75 NY2d at 696). Measured by this standard, the evidence falls short.
There was testimony and forensic evidence that Cabrera, a young and inexperienced but sober driver, entered a tricky downhill curve, the site of other accidents, at a rate of speed well in excess of the posted warning sign. This behavior is certainly negligent, and unquestionably "blameworthy." But our decisions have uniformly looked for some kind of morally blameworthy component to excessive speed in determining criminal negligence; for example, consciously accelerating in the presence of an obvious risk (see Paul V.S., 75 NY2d 944 [1990]). No such morally blameworthy behavior could be inferred from the testimony in this case.[2] For a 17 year old to badly misgauge his ability to handle road conditions is not the kind of seriously condemnatory behavior that the Legislature envisioned when it defined "criminal negligence," even though the consequences here were fatal. This crash resulted from noncriminal failure to perceive risk; it was not the result of criminal risk creation.
Next, at the time of the accident, Cabrera was transporting more than two teenagers who were nonfamily members, *379 and his passengers were not wearing seat belts. As an initial matter, we reject Cabrera's contention that these license violations are "logically irrelevant" because criminal negligence may not turn on whether (holding everything else equal) the accident happened on the day it did or several months later, when Cabrera reached the age of 18 and these restrictions would no longer have been in force. While appealing, this argument ignores the fact that the law makes age-based distinctions all the time. The Legislature adopted a graduated licensing scheme to reduce the level of teen automobile crashesthe leading cause of death among teenagersby making full driver's licensing privileges contingent upon a period of safe driving during which various restrictions apply, including those limiting the number of minor passengers who are nonfamily members[3] and requiring the wearing of seat belts (see Bill Jacket, L 2002, ch 644). Yet even if, as the dissent argues, New York's graduated licensing scheme was meant to reduce the likelihood of "risky driving behavior to impress peers" (and there is evidence in the legislative history of the graduated licensing law to the contrary),[4] Santiago Mendoza's trial testimony does not support the inference that Cabrera was showing off or was distracted by *380 conversation with his passengers in the moments prior to the accident. Simply put, Cabrera's failure to ensure that his passengers wore seat belts was not conduct causing or contributing to the risk of an automobile accident; the fact that Cabrera's passengers were teenagers likewise did not cause or contribute to the crash.
In sum, even when viewed in the light most favorable to the People, the evidence adduced at Cabrera's trial was insufficient as a matter of law to sustain his convictions for criminally negligent homicide and third-degree assault. Because we reverse these convictions, we need not and do not reach Cabrera's alternative argument that he is entitled to a new trial because of flawed jury instructions.
Accordingly, the Appellate Division's order should be modified by dismissing the three counts of criminally negligent homicide and the count of assault in the third degree and vacating the sentences imposed thereon (see CPL 470.40, 470.20 [3]) and, as so modified, affirmed.
GRAFFEO, J. (dissenting).
I respectfully dissent. Defendant, a 17-year-old driver possessing a junior operator's license (class DJ), was involved in a crash that resulted in the death of three of his passengers and serious injuries to a fourth. A jury convicted defendant of criminally negligent homicide, third-degree assault and several Vehicle and Traffic Law violations. We are asked whether the evidence presented was legally sufficient to support the verdict and whether proof that defendant failed to comply with certain conditions of his junior license was admissible at trial. I believe that both of these questions should be answered in the affirmative and would uphold the convictions.
Not surprisingly, a number of our precedents addressing the legal sufficiency of convictions predicated on criminal negligence involve automobile accidents. As recounted by the majority, we *381 have repeatedly determined that excessive speed, when coupled with some other culpable conductsuch as drag racing, driving the wrong way or running a red lightconstitutes legally sufficient evidence (see e.g. People v Ricardo B., 73 NY2d 228 [1989]; People v Rooney, 57 NY2d 822 [1982]; People v Haney, 30 NY2d 328 [1972]). In this regard, we have indicated that sufficiently criminal, culpable risk-creating conduct may include "dangerous speeding, racing, failure to obey traffic signals, or any other misconduct that created or contributed to a `substantial and unjustifiable' risk of death" (People v Boutin, 75 NY2d 692, 697-698 [1990]).[1]
The issue in this case is whether defendant possessed the requisite mens rea of criminal negligence at the time he lost control of his vehicle. It is settled law that a "verdict is legally sufficient when, viewing the facts in a light most favorable to the People, there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (People v Danielson, 9 NY3d 342, 349 [2007] [internal quotation marks and citation omitted]). A sufficiency inquiry obligates a court "to marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (id.).
Here, even excluding consideration of the evidence relating to defendant's junior license violations, I believe that this case falls within the ambit of our precedents sustaining convictions for criminally negligent homicide. Viewing the evidence in a light most favorable to the People, this case involved much more than excessive speed. Defendant was familiar with Sackett Lake Road, a two-lane country byway divided by a double yellow line with a posted speed limit of 55 miles per hour. A warning sign with a recommended speed limit of 40 miles per hour preceded the left-hand curve where the accident occurred. According to the testimony of an accident reconstruction expert, as defendant approached the curve, he partially crossed the double yellow line into the oncoming lane of traffic before losing control of his vehicle. The evidence demonstrated that defendant did not apply his brakes as he approached the curve or even when he *382 attempted to negotiate it. Rather, he drove 70 to 72 miles per hour into the curve, at which point his SUV entered "critical speed yaw," rotated and slid off the road, crashing into and severing a utility pole.
Giving the People all the favorable inferences from the proof presented, as we must, there was ample evidence for the jury to find that defendant was attempting to achieve a racing car-type stunt as he drove into the curve. Trooper Conklin, a collision reconstruction specialist with the State Police, testified that defendant's excessive speed and decision to cross the double yellow line in anticipation of the curve were consistent with an attempt "to negotiate the curve inside and in other words flatten[] out the curve." Investigator Scalia, another collision reconstruction expert employed by the State Police, assisted Trooper Conklin in reconstructing the crash. He defined "flattening out a curve" to mean "when you come on [a] turn, you are cutting, you are bringing over [the] yellow or center line a little bit [so] you can flatten that turn out with [the] car." The proofthat defendant crossed the double line prior to entry, came into the curve at 70 to 72 miles per hour and failed to apply the brakessupports this inference. Hence, contrary to the majority's conclusion, the People did present legally sufficient evidence of excessive speed coupled with independently culpable, "blameworthy conduct creating or contributing to a substantial and unjustifiable risk of a proscribed result" (People v Conway, 6 NY3d 869, 872 [2006] [internal quotation marks and citation omitted]), beyond what the majority characterizes as a mere "failure to perceive risk" by an inexperienced driver (majority op at 378).
I find the majority mischaracterizes the People's case when it asserts that the prosecution did not present this theory to the jury. In their opening statement, the People clearly advanced this concept, commenting that the evidence would show that defendant viewed the bend as a "NASCAR curve" and that he sought "to flatten that curve out like [a] NASCAR driver." Echoing this contention in the closing statement, the prosecutor remarked that defendant intentionally cut the curve and tried to take it at 70 to 72 miles per hour even though he was "no NASCAR driver." Although the prosecutor conceded that defendant did not "intentionally d[o] it" (majority op at 378 n 2), this statement can fairly be interpreted to mean that defendant did not intend to crash his vehicle.
Turning to the evidence relating to defendant's violations of the restrictions on his junior license, defendant contends that *383 the jury should have been precluded from considering this proof in assessing whether he was criminally negligent.[2] The majority apparently rejects this argument, as do I. It is well established that, in cases where criminal negligence is at issue, the jury "must evaluate the actor's failure of perception and determine whether, under all the circumstances, it was serious enough to be condemned" (Ricardo B., 73 NY2d at 236 [emphasis added]). In other words, a determination of what amounts to criminal negligence depends "entirely on the circumstances of the particular conduct" (Haney, 30 NY2d at 335). Relatedly, we have recognized that criminally negligent homicide "serves to provide an offense applicable to conduct which is obviously socially undesirable. It proscribes conduct which is inadvertent as to risk only because the actor is insensitive to the interests and claims of other persons in society" (Boutin, 75 NY2d at 696 [internal quotation marks, citation, brackets and emphasis omitted]).
As the holder of a class DJ license, defendant was not authorized to operate a vehicle with more than two passengers under the age of 21 unless the other passengers were family members or he was accompanied by a parent or guardian, and he was required to ensure that all occupants of the vehicle wore seat belts (see Vehicle and Traffic Law § 501-b [2]).[3] The Legislature enacted this provision in 2002 as part of an overall graduated licensing system, and these restrictions were designed, at least in part, for the purpose of "limiting [teenagers'] exposure to hazardous driving situations" due to their inexperience and tendency to be easily distracted while driving (Sponsor's Mem, 2002 McKinney's Session Laws of NY, at 2114). The Legislature recognized that the national crash rate for teens is four times higher than that for adults and that car accidents are the leading cause of death for teens due to "the propensity of young drivers to take risks, their belief that they are invincible and their susceptibility to peer pressure" (id.). As the Appellate Division majority found, "the restrictions target conduct that is socially undesirable and dangerous when performed by 16 and 17 year olds and has been shown to lead to preventable deaths" (40 AD3d 1139, 1143 [2007]). Thus, the class DJ license restrictions were enacted to "promote the safe operation of vehicles" by young drivers and advance overall highway safety (Letter *384 from St Transp Dept, Aug. 20, 2002, Bill Jacket, L 2002, ch 644).
It is logical to conclude that a young driver would be less likely to drive carelessly if a parent was in the vehicle and more likely to engage in risky driving behavior to impress peers when there is no parental supervision. Furthermore, the restriction on the number of young passengers is intended to lessen distractions in the vehicle. The facts here well illustrate this point. Had defendant's parent been in the SUV with the four teen passengers, it seems unlikely that he would have attempted to take the turn at 70 to 72 miles per hour. To a lesser extent, the statutory obligation placed on defendant to ensure that his passengers wore their seat belts also factors into whether his overall conduct amounted to criminal negligence.[4] Certainly, contrary to defendant's argument, the jury was not required to ignore these license violations in assessing defendant's culpability under all the circumstances surrounding his conduct.[5]
Order modified, etc.
NOTES
[1] His sisters, of course, were the driver and passenger in the car following the Cabrera vehicle to the lake.
[2] The dissent argues that "there was ample evidence for the jury to find that defendant was attempting to achieve a racing car-type stunt as he drove into the curve" (dissenting op at 382). Yet even the prosecutionwhich asserted every possible inference in a 72-page closing argumentnever made such a claim. To the contrary, the prosecution argued: "I'm not going to stand here and tell you he intentionally did it. I'm not going to look you in the eye and tell you he intended to do it. I'm telling you he failed to perceive the great risk and harm he was creating" (emphasis added).
[3] It is not clear why the dissent focuses on the absence of "defendant's parent" (dissenting op at 384) from the SUV, as the holder of a class DJ license can operate a vehicle with a number of different configurations of underage passengers without the presence of a parent or legal guardian (see Vehicle and Traffic Law § 501-b [1] [c] ["no holder of a class DJ ... (license) shall ... operate a motor vehicle with more than two passengers who are under the age of twenty-one and who are not members of such holder's immediate family, provided ... that (these restrictions) shall not apply when such holder is accompanied by a duly licensed parent"]). Without violating any class DJ license restrictions, the holder of such a license could, for example, transport two of his or her teenage siblings and two of their teenage friends, or any number of his or her underage siblings without the presence of a parent. Moreover, it is unclear why "risky driving behavior to impress peers" (dissenting op at 384) would not extend to one's siblings, or why transporting two teenage peers does not, as a matter of law, encourage "risky driving behavior" while transporting three (or four) teenage peers does. But the import given by the dissent to Cabrera's class DJ license relies on just such a theory.
[4] The dissent's characterization of the graduated licensing law's legislative history is at best incomplete. For example, while the Senate memorandum in support does at one point refer to "limiting [teenagers'] exposure to hazardous driving situations," this is hardly an accurate characterization of the legislation's primary purpose (Mem in Support, 2002 McKinney's Session Laws of NY, at 2114). Indeed, the very same memorandum contains an explicit section titled "PURPOSE" located just below the bill number and the title of the bill; this "PURPOSE" section reads, in its entirety: "PURPOSE: To require young novice drivers to complete a series of experience and education requirements before they obtain full driving privileges" (id. at 2111).

Similarly, the letter from the Department of Transportation in the Bill Jacketthe only other piece of legislative history cited by the dissent (see dissenting op at 383-384)fails to buttress the dissent's argument. In this letter, the Department described the legislation as "a graduated driver's license program where young drivers must demonstrate an ability to competently operate a vehicle before being relieved from certain motor vehicle operating restrictions" (Bill Jacket, L 2002, ch 644, at 14).
Read as a whole, the legislative history indicates that graduated licensing was intended as a carrot to foster safe driving habitsnot as a stick to create strict liability in homicide prosecutions.
[1] The majority correctly rejects defendant's per se position that "excessive speed is never enough to make out a case of criminally negligent homicide" (majority op at 376). I would add that there may be a point at which speed so grossly exceeds the limit that it becomes "dangerous speeding" sufficient to support a conviction.
[2] The issue here is not whether the license violations, standing alone, would be sufficient to support the convictions. Clearly, they would not be.
[3] Class DJ licenses are available for drivers who are under the age of 18 (see Vehicle and Traffic Law § 501 [2] [vi]).
[4] I acknowledge that the failure to comply with seat belt requirements is, by statute, not admissible on the question of liability in civil negligence cases (see Vehicle and Traffic Law § 1229-c [8] ["Non-compliance with the provisions of this section shall not be admissible as evidence in any civil action in a court of law in regard to the issue of liability"]). That statute, however, contains no similar restriction for criminal cases. Furthermore, the statute provides that a failure to use seat belts is admissible on the issue of civil damages. This makes sense because ordinarily a driver's failure to comply with seat belt requirements does not cause an accidentbut it can make injuries more severe. This distinction between liability and damages does not exist in a criminal case.
[5] Defendant's alternative claim that County Court committed reversible error in failing to instruct the jury that excessive speed alone will not support a finding of criminal negligence is without merit.