*472 OPINION OF THE COURT
C. Randall Hinrichs, J.
Defendant has filed a motion seeking review by the court of the minutes of the grand jury proceeding which returned the instant indictment, and dismissal thereupon based upon legal insufficiency of the evidence. The People consent to have the court review the grand jury minutes for legal sufficiency and have provided a copy of the minutes to the court for that purpose. The People aver that the grand jury minutes are legally sufficient.
In arriving at the instant decision the court has received and considered the defendant’s motion with attached exhibits, the People’s affirmation in opposition, and the defendant’s reply affirmation. The court has also read the minutes of the grand jury proceeding, presented on March 4, 2008, March 5, 2008, and March 7, 2008.
Defendant has been indicted as follows: count 1, criminally negligent homicide; count 2, criminally negligent homicide; count 3, criminally negligent homicide; count 4, assault in the third degree; count 5, reckless driving; count 6, speeding; count 7, speeding; count 8, crossing over official markings; and count 9, failing to keep right.
Specifically, defendant contends that the Court of Appeals’ recent analysis in People v Cabrera (10 NY3d 370 [2008]) makes clear that the instant allegations cannot sustain the first four counts of the indictment, all charged under a criminal negligence theory. In arriving at the decision regarding the grand jury proceedings, the court finds that release of the grand jury minutes to the defendant is not “necessary to assist the court in making its determination on the motion.” {See CPL 210.30 [3].) However, in order to properly apply the appropriate legal standard to the applicable facts here, a detailed summary of the evidence presented to the grand jury is necessary.
Facts
The evidence as adduced before the grand jury alleges that on the morning of October 31, 2007, Steven Badke, Jr., then 17 years of age, left the grounds of Smithtown High School in his blue Honda Civic with two friends as passengers, Daniel DiStefano and Michael Western. A coworker of Mr. Badke testified that he saw Badke in the driver’s seat of the Civic at approximately 9:30 a.m. This witness was stopped at a stop light at *473 Ridge and Meadow streets in Smithtown when Badke pulled behind him and honked and waved a hello. The witness also noticed Mr. Western in Badke’s car, but didn’t notice anyone else therein. When the light turned green both vehicles proceeded toward Jericho Turnpike where the witness turned left and saw Badke turn right.
Police Officer Victor Perez testified that on the morning of October 31, 2007 he was dispatched to an accident scene on Jericho Turnpike (also known as Route 25) in Smithtown where he arrived at approximately 9:45 a.m. Officer Perez testified that when he arrived at the scene on Jericho Turnpike, approximately one quarter of a mile east of Old Willets Path, he found the collision involved a blue 2004 Honda Civic and a white 2004 Honda Odyssey minivan. The two vehicles had come to rest on the eastbound lanes of traffic, in the right lane and shoulder, which is the south side of Jericho Turnpike. The Civic was on its side resting on the driver’s side and the Odyssey was upright. The officer testified that the speed limit on Jericho Turnpike at the location of the collision is 55 miles per hour.
The Odyssey was registered to June Aruanno who had been driving it with her son John Aruanno seated in the front passenger seat. The Civic was registered to Steven Badke, Sr. Two victims (later identified as Daniel DiStefano and Michael Western) were already deceased upon the officer’s arrival. John Aruanno, who was already in transit to the hospital by ambulance when Officer Perez arrived, passed away the next morning at University Hospital in Stony Brook from injuries suffered in the accident.
Steven Badke, Jr. and June Aruanno were still at the scene. The officer testified that Mr. Badke had no apparent injuries, but was “definitely shaken up and a little dazed.” Mr. Badke told Officer Perez that he had been driving the Civic. The officer asked him who his passengers were and he couldn’t remember. The officer became concerned for Badke’s well-being and walked him to a nearby ambulance.
Officer Perez checked the status of Badke’s driver’s license on his police computer and found no suspensions or revocations. He then boarded the ambulance and accompanied Badke to the hospital. The officer testified that he specifically looks for indicia of drug and alcohol involvement when investigating fatal traffic accidents and that he did so here as well. He saw no indicia of either drug or alcohol use by Badke. Toxicology reports received later revealed no drugs or alcohol in the systems of either DiStefano or Western.
*474 Police Officer Patrick Hughes testified as to evidence he collected at the scene of the collision using a device called “total station.” Total station uses lasers and prisms to make precise measurements at the scene of car accidents. These measurements, in addition to other observations from the scene, are used to make a diagram of the accident scene drawn to scale. Officer Hughes also extensively photographed the aftermath of the accident scene. The diagram made from the total station data and many of the photographs were introduced into evidence before the grand jury.
Robert Genna, from the Suffolk County Crime Laboratory, testified as to his accident reconstruction of the October 31, 2007 collision. His reconstruction included consideration of the diagram developed from the total station, photographs of the scene, the police accident report, police vehicle examination reports, as well as his own site inspection of both the scene and the vehicles which he conducted on January 22, 2008. Mr. Genna created another diagram which was also received in evidence.
Mr. Genna testified that the Civic driven by Badke was driving in the right westbound lane of Jericho Turnpike at a point where the road was two lanes in both directions separated by two rows of solid double yellow lines (four yellow lines). The Odyssey was traveling eastbound on Jericho Turnpike.
Mr. Genna, based upon his reconstruction and all the information gathered and by referring to the diagram which he created, described for the grand jury the events leading up to the collision as follows:
“So this blue Honda [Civic], who was going from the right to the left which would be westbound. The eastbound is here. This is the travel path of the white van, and this is the blue Honda. The blue Honda, as a result of the tire marks, goes into a clockwise rotation, exposing the right side or the passenger side to the front of the white Honda vehicle. This is where they engage. This white Honda rotates out and ends up here, several feet away from the area of impact in an easterly direction. The blue Honda at this point goes into a clockwise rotation and collides with the guardrail. Portions of the blue Honda that are separated are found in the wooded area on the side of the guardrail. The blue Honda makes contact with the guardrail. It still has much energy as it travels along the guardrail and comes to a final rest.”
*475 Mr. Genna testified that, again based upon his reconstruction, the minimum range of speed of the Civic prior to impact with the Odyssey was 82 to 87 miles per hour, and the Odyssey was traveling at 52 miles per hour.
Legal Analysis
“Legally sufficient evidence — defined as ‘competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant’s commission thereof (CPL 70.10 [1]) — means simply a prima facie case, not proof beyond a reasonable doubt (People v Mayo, 36 NY2d 1002, 1004). The reviewing court must consider whether the evidence, viewed most favorably to the People, if unexplained and uncontradicted — and deferring all questions as to the weight or quality of the evidence — would warrant conviction (People v Mikuszewski, 73 NY2d 407, 411; People v Jennings, 69 NY2d, at 114-115).” (People v Swamp, 84 NY2d 725, 730 [1995].)
The Court of Appeals decision in People v Cabrera (10 NY3d 370 [2008]), decided after the instant grand jury presentation, involves facts strikingly, and sadly, similar to the instant allegations. In Cabrera, the Court of Appeals reversed convictions for and dismissed three counts of criminally negligent homicide, and one count of assault in the third degree (charged under a criminal negligence theory) finding insufficient evidence as a matter of law to support criminal negligence. Cabrera, a 17 year old with a junior license, was driving with four teenaged passengers in his car on a hilly, winding road with a posted speed of 55 miles per hour. Mr. Cabrera lost control of the vehicle and crashed killing three passengers and injuring the fourth. No drugs or alcohol were involved.
Criminal negligence is defined in Penal Law § 15.05 (4) as follows:
“A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.”
*476 The Court of Appeals points out in Cabrera that it has examined this definition in detail on numerous occasions. In People v Conway (6 NY3d 869 [2006]) the Court explained
“the carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and that the carelessness must be such that its seriousness would be apparent to anyone who shares the community’s general sense of right and wrong. Moreover, criminal negligence requires a defendant to have engaged in some blameworthy conduct creating or contributing to a substantial and unjustifiable risk of a proscribed result; nonperception of a risk, even if [the proscribed result occurs], is not enough.” (Conway at 872 [citations and internal quotation marks omitted].)
In the context of automobile accidents, the court has explained that criminal negligence requires some risk “creation,” rather than the “nonperception of risk.” The question in Cabrera, as here, was whether defendant had engaged in some risk creation. The court looked to its prior holdings regarding cases wherein speeding was a factor in an automobile accident which resulted in a verdict under a criminal negligence theory and held as follows:
“In short, it takes some additional affirmative act by the defendant to transform ‘speeding’ into ‘dangerous speeding’; conduct by which the defendant exhibits the kind of ‘serious[ly] blameworth[y]’ carelessness whose ‘seriousness would be apparent to anyone who shares the community’s general sense of right and wrong’ (Boutin, 75 NY2d at 696 [citations omitted]). Thus, in the cases where we have considered the evidence sufficient to establish criminally negligent homicide, the defendant has engaged in some other ‘risk-creating’ behavior in addition to driving faster than the posted speed limit (compare People v Haney, 30 NY2d 328 [1972] [defendant was speeding on city street and failed to stop at red light before killing pedestrian crossing street with green light in her favor]; People v Soto, 44 NY2d 683 [1978] [defendant, who was speeding and drag racing on city street, struck and killed driver stopped at red light]; People v Ricardo B., 73 NY2d 228 [1989] [defendant was drag racing at between 70 and 90 miles per hour on a busy metropolitan street, ran a red light and struck vehicle cross *477 ing intersection with light in its favor]; People v Loughlin, 76 NY2d 804, 807 [1990] [intoxicated defendant was speeding on obstructed street under construction in residential neighborhood in Queens]; People v Maher, 79 NY2d 978, 980 [1992] [intoxicated defendant drove at speeds of 50 to 100 miles per hour in 35 miles per hour zone in Manhattan, disobeying several traffic signals]; People v Harris, 81 NY2d 850, 851-852 [1993] [‘defendant, while legally intoxicated, drove his motor vehicle in the dark of night from a public highway into an unfamiliar farmer’s field, accelerated at times to a speed approximating 50 miles per hour, intermittently operated the vehicle without headlights, and suddenly and forcefully drove through a hedgerow of small trees and shrubs, not knowing what obstacles and dangers lurked on the other side’]; People v Ladd, 89 NY2d 893, 894-895 [1996] [intoxicated defendant driving on wrong side of a foggy road at 4:30 a.m.], with People v Perry, 123 AD2d 492, 493 [4th Dept 1986], affd 70 NY2d 626 [1987] [no criminal negligence present where defendant was driving approximately 80 miles per hour in a 55 miles per hour zone ‘on a rural road, on a dark night,’ struck a utility pole, and killed two passengers; defendant’s ‘conduct . . . d(id) not constitute a gross deviation from the ordinary standard of care held by those who share the community’s general sense of right and wrong.’]” (Id. at 377-378.)
In applying this standard, the court found insufficient evidence to conclude that Cabrera’s conduct constituted “not only a failure to perceive a risk of death, but also some serious blameworthiness in the conduct that caused it.” (Cabrera at 378.) The Cabrera court considered various other factors, alleged by the People to have evidenced blameworthy conduct by Cabrera in addition to speeding, such as driving with a junior license, having more passengers than a junior license allows, failing to ensure his passengers wore seatbelts and being distracted by or showing off for his passengers. Although specifically rejecting Cabrera’s contention that the license violations were “logically irrelevant” to the accident, the court concluded that none of these factors was conduct causing or contributing to the risk of an automobile accident. (Cabrera at 379.)
Similarly here, considered in the light most favorable to the People, there is insufficient evidence from which to conclude *478 that any other factor in addition to speed converts Mr. Badke’s actions to “dangerous speeding,” as defined by case law, evincing criminal negligence. Clearly, Mr. Badke’s alleged conduct evinces extremely poor judgment with devastating results. However, the court must look to the conduct of the defendant which caused the accident in determining the legal sufficiency of the evidence as to criminal negligence, not the results, no matter how tragic those results.
The People contend that, here, a number of factors evidence blameworthy conduct on the part of the defendant, in addition to speeding, including: cutting class, driving during the latter stages of rush hour on a heavily traveled road, and a “very dramatic pressing of the brake pedal.” In the court’s view, none of the factors cited by the People are factors which can be considered “risk-creating” behavior on the part of the defendant. Further, there is no factual support for the People’s position that the defendant drove a particular route so he could “open it up,” an apparent reference to rapid speeding-up of the vehicle.
The tragic results here are unfortunately not unique. The loss of life resulting from inexperienced teen drivers is a national problem of epidemic proportions. “According to the analysis conducted by the Pacific Institute for Research and Evaluation for AAA, drivers ages 15 to 17 in 2006 were involved in about 974,000 crashes, injuring 406,427 people and killing 2,541.”[1] Initiatives have been proposed in most states in an effort to address the problem. The Automobile Association of America proposes tougher driver’s licensing laws for teens including: longer license probationary periods for teens, stricter driving curfews, limits on number of teen passengers, and longer periods of mandatory adult-supervised driving during the permit stage.[2] These changes, no matter how plainly necessary, may only come from state legislatures.
This court’s decision in this particular case must be based upon application of the appropriate legal standard, as clearly set forth by the Court of Appeals, to the facts as presented. The' facts presented here are, for the reasons stated herein, legally *479 insufficient to establish that the defendant acted with criminal negligence. Accordingly, defendant’s application to dismiss the first four counts of the indictment charging criminally negligent homicide (three counts) and assault in the third degree is granted.
The court finds that the remaining counts of reckless driving, speeding (two counts), crossing over official markings, and failing to keep right are all supported by legally sufficient evidence. The court notes as to reckless driving that, despite the name of the charge, “the culpable mental state of recklessness, as set forth in Penal Law § 15.05 (3), is not an ‘element’ of the offense of reckless driving” (People v Ackroyd, 144 Misc 2d 149, 154 [Sup Ct, Albany County 1989]). See also the elements of reckless driving as defined in the Criminal Jury Instructions (CJI2d[NY] Vehicle and Traffic Law § 1212). The evidence amply supports that defendant allegedly drove “in a manner which unreasonably interferes with the free and proper use of the public highway, or unreasonably endangers users of the public highway.” (Vehicle and Traffic Law § 1212.)

. Automobile Association of America (AAA) Web site: AAA Analysis Finds Teens Cost Society More Than $34 Billion Annually, http:// www.aaanewsroom.net/Main/Default.asp?CategoryID=7&ArticleID=601.

. Daily News Central Web site, Jan. 19, 2006: AAA Proposes Tough Measures to Improve Teen Driver Safety, http://health.dailynewscentral.com/ content/view/0002065/52/.