People v Gerbino (2018 NY Slip Op 03179)





People v Gerbino


2018 NY Slip Op 03179


Decided on May 3, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: May 3, 2018

109555

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
ROBERT R. GERBINO, Appellant.

Calendar Date: March 28, 2018

Before: Garry, P.J., McCarthy, Lynch, Clark and Pritzker, JJ.


Nicholas E. Tishler, Niskayuna, for appellant.
John M. Muehl, District Attorney, Cooperstown (Michael F. Getman of counsel), for respondent.


Clark, J.

MEMORANDUM AND ORDER
Appeal from a judgment of the County Court of Otsego County (Lambert, J.), rendered July 13, 2015, convicting defendant following a nonjury trial of the crime of criminally negligent homicide.
In November 2013, defendant — a licensed and experienced hunter of over 30 years — and three other licensed hunters, including the victim, went on a hunting trip to a property in the Town of Westford, Otsego County. Prior to hunting, as part of their hunting safety plan, the foursome agreed that they would hunt from separate tree stands located on the property. The path to each tree stand had been marked with fluorescent tape and had been previously adjusted "so that no stand had the hunter aimed in the direction of the other hunters." The hunters also agreed
that they would not engage in the hunting technique of "driving" the deer. During their first morning hunt, defendant and two of his companions reached their respective tree stands; however, the victim was unable to locate his designated stand and, because he was using a flashlight, was seen by the other hunters "wandering back to the camp." Upon returning to the camp after the morning hunt, defendant and one of the other hunters — the property owner — spoke with the victim "about the danger of walking back the way he had and discussed how if in the future he left before the hunt was over, he should walk over the bank, down by the stream, where he would be out of the line of fire of any of the other hunters."
The parties reentered the woods around 2:00 p.m. for their afternoon hunt. Roughly [*2]three hours later, defendant "saw what he thought were antlers in the same area where he had twice before on hunting trips shot a deer." From a distance of approximately 40 yards, defendant "raised his gun, looked through the scope, saw what he thought was the gray of the deer's chest and fired one shot." Defendant radioed the property owner that he had shot a buck and, after waiting "several minutes to see whether or not his deer would take off," he went to check on the deer. Upon reaching the area at which he shot, however, defendant realized that he had shot the victim, his best friend of 17 years. The victim was "no where near the stream below the bank [that] he was to follow on his way back if he left his tree stand early."
Defendant radioed the property owner that he had shot the victim, and the property owner called 911. When help arrived, defendant was "curled up on the ground next to [the victim] inconsolable in a fetal position." Defendant fully cooperated with the police during the subsequent investigation, which revealed that there was "absolutely no malice between" defendant and the victim. All parties agreed that "what occurred was not an intentional act, but rather a tragic accident." A later autopsy of the victim's body demonstrated that, unbeknownst to defendant, the victim had both cocaine and opiates in his system. In contrast, "[t]here was absolutely no indication of any drug or alcohol use" by defendant. Further, the coroner was quoted as saying that the camouflage clothing worn by the victim "may have looked like antlers." Defendant thought, in retrospect, that "perhaps . . . it was the rifle slung over [the victim's] shoulder which appeared to be antlers."
Defendant was thereafter indicted on the charge of criminally negligent homicide. Defendant waived his right to a jury trial and consented to a nonjury trial on the foregoing stipulated facts, at the conclusion of which he was found guilty of criminally negligent homicide. County Court sentenced defendant to a three-year conditional discharge and imposed a $1,000 fine, as well as fees and surcharges. Defendant appeals, solely arguing that the facts, as stipulated to by the parties, were legally insufficient to establish that he acted with the culpable mental state of criminal negligence, as required to support a conviction for criminally negligent homicide.
"A person is guilty of criminally negligent homicide when, with criminal negligence, he [or she] causes the death of another person" (Penal Law § 125.10). As relevant here, the mens rea of "criminal negligence," as required for criminally negligent homicide, is the "fail[ure] to perceive a substantial and unjustifiable risk" of death (Penal Law § 15.05 [4]). That "risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation" (Penal Law § 15.05 [4]). "[C]riminal liability cannot be predicated on every act of carelessness resulting in death[;] the carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence" and "must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong" (People v Boutin, 75 NY2d 692, 695-696 [1990]; see People v Conway, 6 NY3d 869, 871-872 [2006]; People v Ricardo B., 73 NY2d 228, 235 [1989]). The defendant must "engage[] in some blameworthy conduct creating or contributing to a substantial and unjustifiable risk" (People v Boutin, 75 NY2d at 696; see People v Cabrera, 10 NY3d 370, 376 [2008]). Nonperception of a risk is insufficient to establish criminal negligence (see People v Conway, 6 NY3d at 872; People v Boutin, 75 NY2d at 696; People v Munck, 92 AD3d 63, 70 [2011]).
Viewing the evidence in the light most favorable to the People (see People v Acosta, 80 NY2d 665, 672 [1993]; People v Contes, 60 NY2d 620, 621 [1983]; People v Guglielmo, 30 AD3d 830, 831 [2006], lv denied 7 NY3d 813 [2006]), there is no valid line of reasoning that could have led County Court to conclude that defendant engaged in any "blameworthy conduct" [*3]that created or contributed to a substantial and unjustifiable risk of death (People v Boutin, 75 NY2d at 696; see People v Cabrera, 10 NY3d at 376-377). As stipulated to by the parties, and unlike in People v Smith (121 AD3d 1297 [2014], lv denied 25 NY3d 1172 [2015]), defendant had "no reason to believe [that] any of his three companions would be in the area where he was shooting." Defendant's hunting party was not engaged in the hunting practice of "driving" the deer (compare People v Smith, 121 AD3d at 1299 and n 1), and they had instead agreed to hunt from separate, stationary tree stands that had been specifically positioned prior to the hunt "in such a way that no one would be shooting in the direction of another hunter." Additionally, after the victim had taken a dangerous path back to the camp during the morning hunt, defendant and the property owner had specifically advised the victim that, should he decide to again leave his designated stand before the hunt was over, he should take a specific route, along a nearby stream, that was outside of the hunters' respective lines of fire. Moreover, there was no evidence that defendant had consumed any alcohol or drugs prior to the hunt, and he was unaware that the victim had cocaine and opiates in his system. While defendant made the tragic and deadly error of mistaking the camouflage-dressed victim for a buck, we cannot say — under the stipulated set of facts — that his actions rose to the level of criminal negligence (see Penal Law § 15.05 [4]; compare People v Smith, 121 AD3d at 1299-1300; People v Guglielmo, 30 AD3d at 831-832). Accordingly, because the evidence was insufficient as a matter of law to sustain defendant's conviction for criminally negligent homicide, the judgment of conviction must be reversed and the indictment dismissed.
Garry, P.J., McCarthy, Lynch and Pritzker, JJ., concur.
ORDERED that the judgment is reversed, on the law, and indictment dismissed.