■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALEXANDER JOYNER, Appellant. [7 NYS3d 160]—

Appeal by the defendant from a judgment of the Supreme Court, Queens County (Kohm, J.), rendered February 29, 2012, convicting him of criminal possession of a weapon in the second degree (two counts), upon a jury verdict, and imposing sentence.

Ordered that the judgment is reversed, on the facts, the indictment is dismissed, and the matter is remitted to the Supreme Court, Queens County, for further proceedings consistent with CPL 160.50.

On May 22, 2010, New York City Police Department Detective Michael Wallen was assigned as the arresting officer in a police raid of a party hosted by the "Booty Ranch" organization, which was known for throwing parties where deals for prostitution were made. There were 60 to 100 people at the party. There were four undercover officers working with the investigation. One of those undercover officers, referred to as UC 155, provided the information to Detective Wallen that led to the defendant's arrest.

At about 4:40 a.m. on May 22, 2010, a field team of 20 to 25 police officers raided the Booty Ranch party. UC 155 testified at trial that, during the "pandemonium," "chaos," and "confusion" that ensued during the police raid, and while in a dimly lit room, he saw the defendant reach down into his crotch, pull out an unidentified object, lift a window shade, and toss the object at a closed window. The object bounced off the window and back into the defendant's hand. UC 155 then observed the defendant go to an adjacent window, and place the unidentified object to the side of an air conditioner that was installed in that adjacent window. The defendant then moved away, and sat on the floor. At this time, in order to maintain his cover, UC 155 reached into his own pockets and pretended to be extracting drugs so that he appeared to be in need of a place to hide them, since uniformed police were arriving, and other people at the party were "ditching" whatever contraband they had in their possession. However, the People presented no evidence with respect to any drugs recovered as a result of the police raid.

UC 155 further testified that, once he had an opportunity to look at the window in which the air conditioner was installed, he observed a small caliber firearm. UC 155 averred that he placed himself at a location where nobody else could access the

firearm, and that he was the closest person to the air conditioner. According to UC 155, when Detective Wallen entered the room, UC 155 signaled to him with respect to the location of the gun and the defendant. At trial, Detective Wallen testified to the contrary, and explained that, upon entering the room during the police raid, he observed that there were people in between UC 155 and the area where the gun was located. On redirect examination, conducted on the day after he gave his direct testimony, Detective Wallen changed his testimony to state that UC 155 was the closest person to the air conditioning unit, despite testifying twice on direct examination that there were people between UC 155 and the air conditioning unit.

Notably, UC 155 also testified that, prior to observing the defendant, he had observed another person at the party carrying a gun in a custom-made holster who "was walking around like security." Although this person was detained after the police raid with the empty holster still on his person, he was not arrested, and no gun was found on his person. Other than the gun that was temporarily placed next to the window in which the air conditioner was installed, no other weapons were recovered from the scene. The subject gun was never tested for fingerprints or DNA. UC 155 testified that he was searched for weapons prior to entering the party, and that he did not bring a gun into the party.

The defendant also testified at trial that he was thoroughly patted down before he entered the premises where the party was held. The defendant further testified that he did not possess a gun, did not toss a gun against a window, and did not attempt to hide a gun near the air conditioner or the window in which the air conditioner was installed. He explained that, during the police raid, when everyone was "running like roaches," he tossed a "blunt" that he was holding in his hand, and was searching for a place in which to dispose of the "weed in [his] pocket." He further testified that he ran to the vicinity of the rear windows while attempting to hide a bag of marijuana, and that there was a "bunch of people" standing there. He also testified that people were "running to the windows." According to the defendant, he eventually tossed his marijuana by a stereo speaker, not in or near the window in which the air conditioner was installed.

Based upon UC 155's failure to produce his memo book, the Supreme Court gave an adverse inference charge permitting the jury to "infer that all or part of [the] contents of [the memo book] may not have supported and may have contradicted the

People's position at this trial." Although the defendant objected to the wording of the charge on the ground that it did not specifically relate to UC 155's testimony, the People contended that the broad language of the charge was appropriate.

A combination of factors deprived the defendant of a fair trial. The People introduced evidence, including photographs, to show that there was prostitution at the party, but did not connect the defendant to any of the prostitution or to the Booty Ranch organization. In addition, the prosecutor cross-examined the defendant with respect to the shooting death of a friend of his years prior to the date of the crime charged. During summation, the prosecutor made several comments suggesting that the someone could be "guilty by association" with the Booty Ranch Organization. The admission into evidence of photographs showing prostitutes, the prosecutor's cross-examination of the defendant about the shooting death of his friend, and the prosecutor's improper "guilty by association" comments during summation deprived the defendant of a fair trial (*see People v Crimmins*, 36 NY2d 230, 237-238 [1975]; *People v Morgan*, 111 AD3d 1254, 1255-1256 [2013]; *People v Leuthner*, 216 AD2d 327 [1995]; *People v Parker*, 178 AD2d 665 [1991]).

Moreover, upon the exercise of our factual review power, we conclude that the verdict convicting the defendant on two counts of criminal possession of a weapon in the second degree was against the weight of the evidence. "Upon [a] defendant's request, the Appellate Division must conduct a weight of the evidence review" and, thus, "a defendant will be given one appellate review of adverse factual findings" (*People v Danielson*, 9 NY3d 342, 348 [2007]). "If a finding in favor of the defendant would not have been unreasonable, then this Court 'must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions' " (*People v Curry*, 112 AD3d 843, 844 [2013], quoting *People v Danielson*, 9 NY3d at 348). "Once this Court conducts such an analysis, it must then decide whether the verdict finding the defendant guilty beyond a reasonable doubt was warranted" (*People v Curry*, 112 AD3d at 844). This Court essentially "sits as a thirteenth juror and decides which facts were proven at trial" (*People v Danielson*, 9 NY3d at 348). If it appears that the factfinder failed to give the evidence the weight it should be accorded, then this Court may set aside the verdict and dismiss the accusatory instrument or any reversed count (*see* CPL 470.20 [5]; *People v Romero*, 7 NY3d 633, 643-644 [2006]; *People v Mateo*, 2 NY3d 383, 410 [2004]). Application of these principles here warrants our conclusion that reversal is appropriate.

To sustain a conviction of criminal possession of a weapon in the second degree under count one of the indictment, the People were obligated to establish, beyond a reasonable doubt, that the defendant possessed a loaded firearm with the intent to use it unlawfully against another (*see* Penal Law § 265.03 [1] [b]). Possession of a loaded weapon is presumptive evidence of an intent to use it unlawfully against another (*see* Penal Law § 265.15 [4]; *People v Vincent*, 80 AD3d 633, 634 [2011]).

To sustain a conviction of criminal possession of a weapon in the second degree under count two of the indictment (Penal Law § 265.03 [3]), the People were obligated to establish, beyond a reasonable doubt, that the defendant knowingly possessed a loaded firearm outside his home or place of business.

"Knowing possession of tangible property may in the appropriate circumstances be inferred from evidence showing that the defendant had the property in his physical possession, or that he exercised dominion or control over the property by a sufficient level of control over the area in which the property is found or over the person from whom the property is seized" (*People v Muhammad*, 16 NY3d 184, 188 [2011] [internal quotation marks and brackets omitted]; *see People v Manini*, 79 NY2d 561, 573 [1992]; *see also* Penal Law § 10.00 [8]). Upon the exercise of our factual review power (*see* CPL 470.15), we conclude that acquittal of the charges for criminal possession of a weapon in the second degree under counts one and two of the indictment would not have been unreasonable based upon the evidence presented (*see People v Davis*, 117 AD3d 840, 843 [2014]; *People v Marchena*, 116 AD3d 713, 714 [2014]). Indeed, the jury would have been entitled to credit the defendant's testimony, and to discredit the entirety of the People's witnesses based upon, among other things, the adverse inference charge as given and the inconsistent testimony of the People's witnesses.

Moreover, UC 155 admittedly never observed a firearm on the defendant's person at any time. Both UC 155 and Detective Wallen agreed that, at the time that Detective Wallen entered the room, the defendant was positioned further away than UC 155 from the area where the gun was found. However, Detective Wallen and UC 155 contradicted each other as to whether there were people in between UC 155 and the gun. This inconsistency undermines the People's contention that the defendant had constructive possession of the gun found in the window (*see People v Muhammad*, 16 NY3d at 188; *People v Manini*, 79 NY2d at 573).

The People adduced no evidence that the window in which

the air conditioner was installed had been checked prior to when the defendant walked near it. UC 155 never testified as to how much time elapsed between his observation of the defendant's placement of an unidentified object in the window area and his observation of the gun. In light of the "pandemonium" that ensued during the police raid, the number of people in the vicinity of the gun attempting to discard contraband, and the dim lighting, we find UC 155's observations of the defendant to be unreliable. Moreover, UC 155's credibility was undermined by his failure to produce his memo book, and the inconsistency between his and Detective Wallen's testimony.

Finally, we also reject as incredible any suggestion, based on UC 155's testimony, that the unidentified object that the defendant allegedly tossed against a window, and which bounced back into the defendant's hand, was a gun, as argued by the People. "The rule is that testimony which is incredible and unbelievable, that is, impossible of belief because it is manifestly untrue, physically impossible, contrary to experience, or self-contradictory, is to be disregarded as being without evidentiary value, even though it is not contradicted by other testimony or evidence introduced in the case" (*People v Garafolo*, 44 AD2d 86, 88 [1974] [internal quotation marks omitted]; *see Cruz v New York City Tr. Auth.*, 31 AD3d 688, 690 [2006], *affd* 8 NY3d 825 [2007]; *People v Lebron*, 184 AD2d 784, 785 [1992]). Indeed, UC 155 insisted that he could not identify the object that was thrown against the window, and he assumed that the object was a container or bag of drugs.

Accordingly, the evidence presented at trial did not establish, beyond a reasonable doubt, that the defendant was either in physical or constructive possession of the firearm found near the window. Thus, the judgment must be reversed and the indictment dismissed (*see* CPL 470.20 [5]; *People v Romero*, 7 NY3d 633 [2006]; *People v Davis*, 117 AD3d at 843).

In light of our determination, we need not reach the defendant's remaining contentions. Hall, Austin and Barros, JJ., concur.

Dillon, J.P., dissents, and votes to affirm the judgment. I respectfully dissent from my colleagues, and vote to affirm the judgment of conviction.

During the early morning hours of May 22, 2010, the defendant was attending a "Booty Ranch" party at a two-story building on Sutphin Avenue in Queens, where men meet scantily-clad prostitutes to exchange information that will lead to future transactions between them. At least two undercover officers were stationed in the room of the building where the party was

being held, and a police raid began at approximately 4:40 a.m. The defendant was arrested at the scene, and ultimately convicted by a jury of two counts of criminal possession of a weapon in the second degree, one under Penal Law § 265.03 (1) (b), involving the defendant's possession of a loaded gun with intent to use it against another, and one under Penal Law § 265.03 (3), involving the defendant's knowing possession of a loaded firearm outside of his home or place of business.

Here, in conducting our independent review of the weight of the evidence, I am satisfied that the verdict of guilt is not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]). The defendant argues that his convictions cannot survive a weight of the evidence review, primarily because another patron at the party had been observed with a holster, incoming patrons were searched at the main door downstairs, and an undercover officer, in all the confusion and excitement surrounding the police raid, could not have reliably observed the defendant. However, simply because another patron was wearing an empty holster and incoming patrons were searched does not mean that the defendant did not possess the loaded and operable gun. In fact, one of the undercover officers testified that, in light of the cursory nature of the search conducted upon him at the door, had he been carrying his own service weapon, he could have smuggled it into the party despite the search. The jury could have rationally inferred that the defendant could have done the same or obtained the gun through other means.

Moreover, regarding the reliability of the undercover officer's observations at the time of the raid, the defendant actually drew attention to himself, according to the officer, by running through the crowd shouting "Five-O," and scrambling to hide an object at or near an air conditioner, within mere feet of the officer. The lighting, though somewhat dimmed, was sufficient for the undercover officer to describe the defendant's brown clothing and red baseball cap. The defendant matched the undercover officer's description of him, admitted his presence at the scene, and admitted scrambling at the far end of the room to hide an object. While the defendant claimed that the object he hid was marijuana, the undercover officer recovered a gun, which was operable and loaded, from a window air conditioner installed at the far end of the room. On this record, the undercover police officer's testimony, which the jury found credible, and which was supported by other evidence in crucial respects, supports the defendant's conviction and is not against the weight of the evidence.

In reaching its conclusion that the undercover officer's testimony was incredible, the majority places great emphasis upon the portion of the officer's testimony that the gun bounced back into the room from the window. Such evidence is not problematic, as the defendant testified on direct examination that he attempted to "toss" the object from his hand, from close enough to the window to be able to touch its window shade, which is to be distinguished from a "throw" of the object. On cross-examination, the undercover officer described the defendant's action as a "lob" that the officer demonstrated, and which the court described as "an upward underhand motion." If, as the officer described, the object was merely lobbed from a close distance, it does not strain credibility that it did not crash through the glass of the window. There is no evidence in the record regarding the thickness or strength of the window. Based upon the weight of the credible evidence, I find that the jury was justified in finding the defendant guilty beyond a reasonable doubt.

In the interest of completeness, I would suggest that, contrary to the defendant's contention, the language of the adverse inference charge was appropriate under the circumstances of this case (*see People v Asaro*, 94 AD3d 773 [2012], *affd* 21 NY3d 677 [2013]; *People v Kotler*, 31 AD3d 787 [2006]). Similarly, the Supreme Court properly instructed the jury on the definition of the term "possess," as set forth in Penal Law § 10.00 (8), including the definition of physical and constructive possession (*see* CJI2d[NY] Possession: Physical and Constructive; *People v Pilgrim*, 293 AD2d 496 [2002]). The defendant's contention that he was deprived of a fair trial by certain remarks made by the prosecutor during summation is largely unpreserved for appellate review (*see* CPL 470.05 [2]; *People v Wright*, 90 AD3d 679 [2011]). In any event, the challenged remarks were, in my view, fair comment on the evidence, were permissible rhetorical comment, constituted a fair response to defense counsel's summation, or otherwise do not warrant reversal (*see People v Galloway*, 54 NY2d 396, 401 [1981]; *People v Ashwal*, 39 NY2d 105, 109-110 [1976]; *People v Hernandez*, 92 AD3d 802, 803 [2012]). The defendant was not deprived of the effective assistance of counsel, as the record reveals that defense counsel provided meaningful representation (*see People v Benevento*, 91 NY2d 708 [1998]; *People v Baldi*, 54 NY2d 137 [1981]). Finally, the photographs in evidence were not prejudicial, but merely completed the narrative of events leading up to the defendant's arrest, and, in any event, any error in admitting them was harmless.

For all of the foregoing reasons, the defendant's judgment of conviction should be affirmed.