People v Derival (2020 NY Slip Op 02072)





People v Derival


2020 NY Slip Op 02072


Decided on March 25, 2020


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 25, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

CHERYL E. CHAMBERS, J.P.
LEONARD B. AUSTIN
SYLVIA O. HINDS-RADIX
HECTOR D. LASALLE
ANGELA G. IANNACCI, JJ.


2017-00603
 (Ind. No. 15-00245)

[*1]The People of the State of New York, respondent,
v
Phylip Derival, appellant.


David I. Goldstein, Chestnut Ridge, NY (John S. Edwards of counsel), for appellant.
Thomas E. Walsh II, District Attorney, New City, NY (Itamar J. Yeger of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the County Court, Rockland County (Victor J. Alfieri, Jr., J.), rendered December 5, 2016, convicting him of criminally negligent homicide, after a nonjury trial, and imposing sentence.
ORDERED that the judgment is reversed, on the facts, the indictment is dismissed, and the matter is remitted to the County Court, Rockland County, for further proceedings consistent with CPL 160.50.
This case arises out of collisions which occurred on August 14, 2013, at 11:45 p.m., among three vehicles traveling northbound on the Palisades Interstate Parkway (hereinafter the parkway), which has two lanes for vehicles traveling in that direction. The three vehicles involved were a Toyota Highlander (hereinafter the Toyota), which was traveling northbound in the right lane, a Dodge Durango (hereinafter the Durango), which was traveling northbound in the left lane, and the defendant's vehicle, which was attempting to pass the other two vehicles. Following the collisions, the defendant's vehicle traveled into the parkway's median situated between the lanes for northbound and southbound traffic and struck a tree, resulting in the death of the defendant's passenger. The defendant was indicted on one count of criminally negligent homicide.
During the nonjury trial, held almost three years after the collision occurred, the People presented testimony from Carly Rahal, 22 years old at the time of trial, who had been driving a vehicle traveling immediately behind the Durango and the Toyota. Rahal and her passengers knew the driver and the passengers in the Durango since they all worked as counselors at a summer camp. They had been at an end-of-summer celebration for the camp's personnel. Rahal was following the Durango because she had been unfamiliar with how to get to the parkway. In her testimony, she described the parkway as a highway with two lanes for northbound traffic with "no streetlights or anything."
Rahal testified that she was initially traveling in the left lane behind the Durango. Before she first observed the defendant's vehicle, another vehicle, which was red (hereinafter the red [*2]vehicle), sped by on the right side of her vehicle. After the red vehicle passed her vehicle and the Durango on the right, it moved in front of the Durango in order to pass the Toyota on the left.
Thereafter, the defendant's vehicle approached Rahal's vehicle from behind in the left lane. Rahal first heard the engine of the defendant's vehicle accelerating and then saw the vehicle in her rearview mirror. Rahal moved her vehicle from the left lane to the right lane to allow the defendant's vehicle to pass. The defendant's vehicle passed Rahal's vehicle on the left, then moved into the right lane, in front of Rahal, before attempting to move back into the left lane in front of the Durango in order to pass the Toyota. Rahal testified that, during this maneuver, the defendant's vehicle first hit the Toyota in front of it and then hit the Durango which was to the left. She also testified that, although she could not tell the distance between the Durango and the Toyota, the two vehicles appeared to be too close to each other to allow the defendant to safely pass.
On cross-examination, Rahal testified that she was traveling at 55 miles per hour, the same speed as the Durango. She recalled that her vehicle and the Durango had entered the parkway at Exit 5, and the collision occurred between Exits 6 and 7. The parties stipulated that, in her grand jury testimony, Rahal stated that there had been enough room for the defendant's vehicle to pass in front of her vehicle and that she did not need to apply pressure to her brakes for the defendant's vehicle to do so. At trial, Rahal acknowledged on cross-examination that, at some point before the defendant's vehicle moved back into the left lane, the defendant's vehicle was traveling at the same rate of speed as the Durango.
The People also presented testimony from Matthew Hochman, 21 years old at the time of trial, who was seated on the rear passenger side of the Durango. Hochman did not remember seeing a red vehicle pass the Durango and the Toyota before the accident. He testified that, just before the accident, the Toyota was traveling in the right lane just behind the Durango. He testified that he heard a loud engine noise, then saw the defendant's vehicle try to cut between the Toyota and the Durango, when there was not enough room to safely do so. Hochman testified that the defendant's vehicle first hit the Toyota and then hit the Durango, though he did not actually see the defendant's vehicle hit the Toyota.
Hochman testified that he saw the defendant's vehicle after it hit the Durango, felt the contact of the impact, and saw sparks. Hochman remembered observing the defendant's vehicle "tumbling" toward the median. However, only a few hours after the incident, Hochman, in a supporting deposition provided to the police, stated that "I was not paying attention. All I remember are sparks flying."
Eric Kaplan, the Durango's front seat passenger, testified on behalf of the People that, just before the accident, the Toyota was in the right lane approximately four feet in front of the Durango. Kaplan testified that he heard the defendant's vehicle approaching but he did not see it in the side view mirror because it was dark and he was not paying attention. Kaplan stated that the defendant, while traveling at a high rate of speed, hit the Durango first and then hit the Toyota. After Kaplan heard the impact of the defendant's vehicle with the Durango, the Durango went into the median where it dodged three or four trees.
Kaplan testified that he never saw the red vehicle. Kaplan did not notice whether David DiNuzzo, the driver of the Durango, removed his foot from the gas pedal before the impact so that the Durango would decelerate. Kaplan also testified that he did not think that DiNuzzo applied the brakes. Kaplan testified that the impact caused the Durango to veer off of the road into the median.
Brian Shure, who was seated behind DiNuzzo, was called by the People as a witness. Shure testified that, prior to the accident, the Durango was traveling in the left lane and the Toyota was traveling in the right lane. A vehicle, which Shure could not describe, sped past the Durango and the Toyota without incident. He then saw the defendant's vehicle approaching in the right lane behind the Durango and that the defendant's vehicle was "going pretty fast." As it attempted to maneuver into the left lane in order to pass the Toyota, the defendant's vehicle hit the Durango's [*3]right front side before rebounding to the right and hitting the Toyota.
During his testimony, Shure estimated that, at the time of impact, the Durango was traveling between 50 and 55 miles per hour. He stated that the Durango "had closed the distance" between itself and the Toyota between the time that the first vehicle had passed the Durango and the Toyota and the time that the defendant's vehicle attempted to pass those vehicles, and that, at the time of the collision between the Durango and the defendant's vehicle, the Toyota was about one car length in front of the Durango. Shure stated that the defendant's vehicle may have slowed as it attempted to pass the Toyota by going from the right lane to the left lane. Shure did not think that DiNuzzo applied hard pressure to the Durango's brakes prior to the impact.
DiNuzzo, the driver of the Durango, was called by the People as a witness. DiNuzzo testified that he was only traveling on the parkway for three to five minutes before the collision occurred. He said that the portion of the road on which he was driving was straight with a slight incline, that the weather was clear, and that the road was not damp. DiNuzzo was driving the Durango in the left lane, and there was a Toyota ahead of the Durango in the right lane. DiNuzzo recalled that, before the accident, a vehicle sped by the Durango on the right, moved into the left lane in front of the Durango, and passed the Toyota at a high rate of speed. He estimated that he was traveling between 53 to 55 miles per hour when the first vehicle passed. As that first vehicle passed, DiNuzzo estimated that there were approximately three car lengths between the Durango and the Toyota, but at the time that the defendant's vehicle approached, there was only one-half a car length to one car length between the Durango and the Toyota.
DiNuzzo testified that he heard the defendant's vehicle's engine from behind before observing the defendant's vehicle through his passenger window. When he realized that the defendant was trying to pass, he applied the brake and decelerated the Durango's rate of speed to allow the defendant's vehicle to pass and move in front of the Durango. DiNuzzo recalled that the defendant's vehicle cleared the Durango's "nose," but then swerved to the right and hit the Toyota. DiNuzzo stated that the defendant's vehicle then "ricocheted off" of the Toyota and hit the Durango while DiNuzzo applied pressure to the brakes. The Durango then veered off of the left lane into the median, where it missed several trees and came to rest on the southbound side of the parkway.
On cross-examination, DiNuzzo reiterated that, before the collision, he had applied the brake and decelerated the Durango's rate of speed, thereby increasing the distance between the Durango and the Toyota. He also testified that, before the collision, the defendant passed and then moved in front of the Durango, so that the defendant's vehicle was "directly in front of me in the left lane."
The People called the driver of the Toyota, Marie Geffrard, who testified that she did not see the defendant's vehicle before she was hit from behind as the defendant's vehicle was trying to maneuver between her vehicle and the Durango. She also claimed to have been hit a second time and that her vehicle and the Durango were going roughly the same speed of 50 miles per hour.
The People presented testimony from Daniel Smith, an Investigator with the New York State Police Collision Reconstruction Unit, who was called to the scene of the collision to conduct an investigation. Smith explained that the speed limit for the area of the parkway where the accident occurred was 50 miles per hour. He explained that, based on information obtained from the Toyota's airbag deployment system, he determined that the Toyota had been traveling at 57 miles per hour three seconds before its airbags deployed. Because the Durango was not equipped with technology to record its speed, Smith determined its speed by analyzing, inter alia, the tire marks it left after the collision. Smith calculated that the Durango had been traveling at least 67 miles per hour when it left the roadway and went into the median. He testified that the damage to the defendant's vehicle had been so extensive that it prevented the air bag module from recording any data related to that vehicle's speed, and that the vehicle's speed could not otherwise be determined.
Smith described the accident as having occurred as the defendant's vehicle "squeezed" in between the Durango and the Toyota in the middle of the two lanes for northbound [*4]traffic. He concluded that the collision was caused by the defendant's unsafe lane change and unsafe speed. Smith did not refer to any of the eyewitnesses' testimony in formulating his opinion. However, Smith testified, as did the eyewitnesses, that there had been contact between the defendant's vehicle and the Durango in addition to the defendant's vehicle coming into contact with the Toyota, but he could not testify as to the sequence of the impacts. Moreover, Smith noted that there was no damage to the left side of the defendant's vehicle which would have been caused by the impact of that vehicle with another vehicle, and that the left side view mirror of the defendant's vehicle was undamaged.
The People also presented testimony from Kevin Tully, an accredited accident reconstructionist. Unlike Smith, Tully believed that the speed of the defendant's vehicle could be determined. Tully testified that, based on his calculations, the defendant's vehicle was traveling at a minimum speed of 92 miles per hour when it struck the Toyota and that, after that impact, the defendant's vehicle slowed down to a minimum of 88 miles per hour as it traveled towards the median. Based upon his review of crash test data which had been gathered by crashing known vehicles at known speeds under controlled laboratory crash testing conditions so that it could be determined what damage results at what speeds, Tully opined that the defendant's vehicle must have been traveling more than 40 miles per hour when it struck the tree.
Moreover, despite the testimony of DiNuzzo, the passengers of the Durango, and Rahal that the defendant's vehicle hit the Durango, Tully opined that, based on the physical evidence, the only collision that occurred was between the defendant's vehicle and the Toyota. When asked about the eyewitness testimony which contradicted his opinion that there was no contact between the defendant's vehicle and the Durango, Tully summarily testified that the eyewitnesses were all "wrong."
The People also called Laura Seijo Carbone, the Chief Medical Examiner of the Rockland County Medical Examiner's Office, who testified that the nature of the victim's injuries was consistent with a high-velocity impact, which she described as a primary impact in excess of or at least 50 miles per hour.
The defendant called Nicholas Bellizzi, an accident reconstruction expert, who testified that when the defendant's vehicle moved to the left lane in front of the Durango, the defendant's vehicle came into contact with the Durango, which caused the defendant's vehicle to veer right and collide with the Toyota before rebounding into the median where it struck a tree. Bellizzi agreed with Smith, the Investigator from the Collision Reconstruction Unit, that, at the time of the collision, the Durango was traveling at least 67 miles per hour and the Toyota was traveling at approximately 57 miles per hour.
Bellizzi opined that, if the defendant's vehicle and the Durango were next to each other and the defendant accelerated to pass the Durango, the Durango must have accelerated as the defendant's vehicle was switching lanes or the defendant's vehicle and the Durango would not have made contact. Further, Bellizzi testified that, as there was "no rear end collision impact" with the Toyota, the entire right side of defendant's vehicle must have been along the left side of the Toyota, indicating that the defendant's vehicle had already passed the Durango. Bellizzi testified that he could not conclude, as Tully had, that the defendant's vehicle was traveling at least 40 miles per hour when it hit the tree. He opined that the crash test data relied upon by Tully in reaching that conclusion was inapplicable, as the accident did not occur in the same manner as the controlled crashes which were performed in a laboratory.
Bellizzi also testified that the medical examiner would be qualified to provide an opinion as to impact calculations only if she had expertise in bio-mechanical engineering. Bellizzi opined that the accident would not have occurred but for the Durango's acceleration.
The defendant testified at trial that his vehicle approached the Durango from behind, then moved into the right lane in order to pass. As the defendant did so, he slowed his vehicle by downshifting from fourth gear to third gear. This caused the engine's RPMs to increase, making a [*5]"louder engine noise." While he shifted gears he had one foot on the clutch and the other foot on the gas, not touching the brakes. At this point, his vehicle was beside the Durango, and going "about the same speed" as the Durango. He testified that there was enough room to pass the Durango, so he accelerated in order to do so. He passed the Durango, shifted back into fourth gear, then began to move back into the left lane. As he switched lanes, he felt an impact to the left front of his vehicle. He stated that the collision occurred because the Durango accelerated and made contact with his vehicle as it was switching lanes, though he did not see the Durango as it hit him. The defendant stated that the next thing he remembered was bouncing on the median and hitting a tree. The defendant did not remember making contact with the Toyota, or where his feet and hands were after making contact with the Durango or when his vehicle was on the median. The defendant testified that photographs of his gearshift taken after the accident showed that his vehicle was in fourth gear on his six-speed gearshift. The defendant denied driving 92 miles per hour or even 70 miles per hour on the parkway that night or making an unsafe lane change.
At the conclusion of the nonjury trial, the County Court found that the evidence demonstrated that the defendant was traveling more than 40 miles per hour above the posted speed limit of 50 miles per hour, and passed another vehicle on the right at a high rate of speed in violation of State law. The court also found that the defendant "attempt[ed] to enter the occupied passing lane at a high rate of speed, causing an impact first with the Toyota [ ] and secondarily with the Durango." Such conduct constituted a grave, substantial, and unacceptable risk supporting a conviction of criminally negligent homicide. On appeal, the defendant contends that the evidence was legally insufficient to establish his guilt of criminally negligent homicide, and that the verdict was against the weight of the evidence.
In evaluating whether evidence presented at trial was legally sufficient, a court must "determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the [factfinder] on the basis of the evidence at trial" (People v Bleakley, 69 NY2d 490, 495; see People v Contes, 60 NY2d 620, 621). Contrary to the defendant's contention, viewing the evidence in the light most favorable to the prosecution, there was legally sufficient evidence to support the defendant's conviction of criminally negligent homicide (see People v Contes, 60 NY2d at 621).
However, upon the exercise of our independent factual review power (see CPL 470.15[5]), we conclude that the verdict of guilt was against the weight of the evidence. "Upon [a] defendant's request, the Appellate Division must conduct a weight of the evidence review" and, therefore, "a defendant will be given one appellate review of adverse factual findings" (People v Danielson, 9 NY3d 342, 348). "[W]eight of the evidence review requires a court first to determine whether an acquittal would not have been unreasonable. If so, the court must weigh conflicting testimony, review any rational inferences that may [have been] drawn from the evidence and evaluate the strength of such conclusions. Based on the weight of . . . credible evidence, the court then decides whether the [factfinder] was justified in finding the defendant guilty beyond a reasonable doubt" (id. at 348). In effect, the Appellate Division serves as a "second jury" (People v Delamota, 18 NY3d 107, 117) and "decides which facts were proven at trial" (People v Danielson, 9 NY3d at 348). "If it appears that the factfinder failed to give the evidence the weight it should be accorded, then this Court may set aside the verdict and dismiss the accusatory instrument" (People v Joyner, 126 AD3d 1002, 1005; see CPL 470.20[5]).
"A person is guilty of criminally negligent homicide when, with criminal negligence, he [or she] causes the death of another person" (Penal Law § 125.10). A person acts with criminal negligence when "he [or she] fails to perceive a substantial and unjustifiable risk that such result will occur or that such [a] circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation" (Penal Law § 15.05[4]).
The defendant's conduct must rise to a level of carelessness where its "seriousness would be apparent to anyone who shares the community's . . . sense of right and wrong" (People v Conway, 6 NY3d 869, 872 [internal quotation marks omitted]; see People v Cabrera, 10 NY3d 370, [*6]376). Moreover, the conduct must create the risk, rather than simply not perceive the risk (see People v Cabrera, 10 NY3d at 377; People v Boutin, 75 NY2d 692, 696).
In cases concerning charges of criminally negligent homicide arising out of automobile accidents involving excess rates of speed, "it takes some additional affirmative act by the defendant to transform speeding into dangerous speeding" (People v Cabrera, 10 NY3d at 377 [internal quotation marks omitted]).
Here, the People failed to establish, beyond a reasonable doubt, that the defendant "fail[ed] to perceive a substantial and unjustifiable risk" (Penal Law § 15.05[4]) which caused the death of his passenger. From the testimony of the People's eyewitnesses and expert witnesses, no single consistent version of how this accident occurred emerges. DiNuzzo's testimony, as highlighted herein and by our dissenting colleagues, is, at best, contradictory and inconsistent, leaving significant doubt as to whether the defendant's actions rose to the level of criminal negligence. Most telling is that the People's experts each provided testimony that was at odds with the other's testimony. The testimony of Smith and Tully presented conflicting versions as to how the accident occurred.
Moreover, the facts on which Smith and Tully based their opinions conflicted with the testimony of the eyewitnesses who were present during the accident (see generally People v Danielson, 9 NY3d at 349). Smith ignored the testimony of DiNuzzo, the driver of the Durango, as to the speed of the Durango, and the testimony of Geffrard, the driver of the Toyota, as to the speed of the Toyota. In formulating his opinion that there was contact among the vehicles, Smith failed to consider the testimony of the Durango's passengers or Rahal. This negatively impacts the weight to be given his opinion, since the absence of any sign of impact on the left side of the defendant's vehicle confirms DiNuzzo's and the defendant's testimony that the defendant had already passed the Durango and was moving into the left lane. Tully eschewed the testimony of the eyewitnesses and rejected it as "wrong" in favor of controlled laboratory crash tests. It is disconcerting that the People's evidence provided no consistent, reliable basis for the County Court's determination.
With respect to the issue of the rate of speed at which the defendant's vehicle had been traveling at the time of impact, the County Court's finding that the defendant was operating his vehicle more than 40 miles per hour above the posted speed limit is not supported by the evidence. Tully was the only witness who testified that the defendant was traveling at that speed prior to impact. However, the People's other expert witness, Smith, testified that it was not possible to determine the speed at which the defendant's vehicle had been traveling at either the point of impact or immediately thereafter given the manner in which this collision occurred. Further, Tully acknowledged that he rendered his opinion as to the speed of the defendant's vehicle based on data from crash tests which were not performed under conditions similar to those in which this collision occurred.
Moreover, Tully's estimate was in direct conflict with the testimony of the eyewitnesses who were operating vehicles at the time of the accident. Rahal, DiNuzzo, and Geffrard each testified that their respective vehicles were traveling at approximately 55 miles per hour at the time that the defendant's vehicle drove up behind them. At some point close in time to the collision, the defendant's vehicle was traveling behind the Durango, albeit for a short period of time, before moving over to the right lane behind the Toyota, which was traveling at 57 miles per hour. Given the placement of the Toyota and the Durango vis-a-vis each other prior to the collision, it would have been impossible for the defendant's vehicle to have been traveling at a rate of speed of 92 miles per hour without causing a heavy rear-end collision with the Toyota or significant passenger-side damage to the Durango; neither of which occurred here. In addition, Rahal testified that the defendant was able to move his vehicle without incident from the left lane to the right lane in front of her vehicle prior to the accident, a move which, according to Tully's testimony, the defendant would not have been able to accomplish if his vehicle was traveling at 92 miles per hour. While Kaplan, a passenger in the Durango, testified that the defendant's vehicle was traveling at a high rate of speed, serious doubt exists as to Kaplan's perception of the relative speed of the vehicles and their distance from [*7]one another given the testimony provided by DiNuzzo at trial and Rahal before the grand jury. Further, while our dissenting colleagues rely on Hochman's recollection at trial, nearly three years after the accident occurred, that the defendant's vehicle had been "going very fast," such reliance ignores the significance of Hochman's statement provided on the night of the accident that he was not paying attention to the details of the accident as it unfolded.
As to the trial court's finding that the defendant improperly changed lanes, Smith's explanation that the defendant tried to squeeze his vehicle in between the Toyota and the Durango as those two vehicles were driving side by side was inconsistent with the testimony of all of the eyewitnesses, upon which Smith acknowledged he did not rely to form his opinion.
Most significant, DiNuzzo, the driver of the Durango, who was called as a witness by the prosecution, testified that the contact between his vehicle and the defendant's vehicle occurred after the defendant's vehicle had cleared the Durango's "nose" and moved "directly in front of" the Durango in the left lane. This establishes that there was enough room for the defendant's vehicle to pass in front of the Durango without contact. Such testimony calls into question the reliability of the opinions of the People's experts that the defendant's movement of his vehicle to the left lane was dangerous. DiNuzzo's testimony also lends credence to the testimony of the defendant and his expert Bellizzi, who respectively testified and opined that the impact with the Durango resulted from the Durango's acceleration as the defendant was in the process of passing the Toyota by moving to the left lane in front of the Durango.
Our dissenting colleagues suggest that the testimony supports a finding of criminal negligence. We cannot agree. To the contrary, the credible evidence demonstrates to a reasonable extent that DiNuzzo failed to yield to the defendant's vehicle, which had passed his vehicle, and then came into contact with the defendant's vehicle thereby setting off the sequence of tragic events which followed.
Further, all four occupants of the Durango, and Rahal, the driver of the vehicle immediately behind the Durango and the Toyota, testified that there was an impact between the defendant's vehicle and the Durango. Tully's opinion that only the Toyota was struck by the defendant's vehicle is not credible in light of this testimony. When confronted with the eyewitnesses's testimony that the Durango was also hit by the defendant's vehicle, Tully asserted dismissively that the eyewitnesses's testimony was "wrong."
Upon the exercise of our factual review power (see CPL 470.15[5]), we determine that an acquittal of criminally negligent homicide would not have been unreasonable (see generally People v Rodgers, 174 AD3d 924, 925). Based on this evidence, we find that the verdict of guilt was against the weight of the credible evidence (see People v Bailey, 102 AD3d 701, 703), and the judgment of conviction must be reversed and the indictment dismissed.
AUSTIN, HINDS-RADIX and IANNACCI, JJ., concur.
LASALLE, J., dissents, and votes to affirm the judgment of conviction, with the following memorandum, in which CHAMBERS, J.P., concurs:
Just before midnight on August 14, 2013, two vehicles, a Dodge Durango (hereinafter the Durango) and a Toyota Highlander (hereinafter the Toyota), were traveling northbound on a two-lane road in close proximity, the Durango in the left lane and the Toyota, slightly ahead, in the right lane, when the defendant, while operating a Nissan Infiniti (hereinafter the Infiniti) and coming from behind at a high rate of speed, attempted to drive through the narrow gap between the other two vehicles while straddling the right and left lanes. After colliding with the Toyota, the defendant's vehicle veered to the left, leaving approximately 112 feet of friction tire marks on the roadway. The defendant's vehicle then careened off the road and traveled another 401 feet on the grassy median before striking a tree with enough force to shear the metal and tear the vehicle into two large pieces. Justin Goings, the passenger in the defendant's vehicle, was instantly killed as a result of multiple [*8]blunt force impact injuries, which the medical examiner described as consistent with a high-velocity impact.
The defendant's decision to pass the two vehicles when it was clearly unsafe to do so, coupled with the dangerous speeding, created as unjustifiable risk which ultimately caused the death of his passenger. Our colleagues in the majority disagree, and choose to credit the views of the defendant's expert—which are not only inconsistent with the physical evidence but also directly contradicted by the defendant's own account of the accident.
Specifically, the defendant's expert, Nicholas Bellizzi, concluded that David DiNuzzo, who was driving the Durango, caused the accident by accelerating and striking the defendant's Infiniti. In support of his opinion that DiNuzzo caused the accident, Bellizzi repeated on numerous occasions throughout his testimony that the Infiniti had successfully changed lanes:
"So we know the Infinit[i] had gotten over to the left, so it was on the left side of the Toyota. . . .That means it had to have gone from the right lane into the left lane, because the right side of the Infinit[i] had to be clear of the left side of the Toyota in order for it to hit the Toyota."
"The entire right side of the Infinit[i] has to be to the left of the entire left side of the Toyota."
"During that time, during that lane change, the Durango, . . . which the Infinit[i] passed, had to then drive and catch up to it. It had to."
"If the Infinit[i] were to try and change lanes with the Durango to its left, they would hit. They would collide. There would be a different collision. So the Infinit[i], in order to hit the Durango, first has to be abreast of it, then has to be ahead of it. Once it's ahead of it, then it can begin that several hundred feet lane change process. So it can't begin until it's passed. So, we know the Infinit[i] passed the Durango."
"The complete right side of the Infinit[i] had to be completely to the left of the left side of the Toyota."
"[T]he Infinit[i] is completely clear of the Toyota when it hits it. That means it had to have made the lane change. . . . [T]he Infinit[i] had to be clear of the left side of the Toyota." When asked if the Infiniti had actually completed the maneuver and now was in the left lane, Bellizzi responded, "[c]orrect." Bellizzi also testified that the Durango "sped up, hit the Infiniti," and "caused the Infiniti to hit the Toyota."
The critical flaw in Bellizzi's theory is that his conclusions not only contradict the testimony of the six eyewitnesses called by the People, but also the physical evidence, and the defendant's own version of how the accident occurred.
Indeed, not one of the three passengers in the Durango ever indicated that DiNuzzo accelerated his vehicle as the defendant was attempting to change lanes—and DiNuzzo himself testified that he decelerated when he realized that the defendant was trying to pass him. Additionally, had the defendant's vehicle successfully completed its lane change as Bellizzi opined, the Durango, upon accelerating, would have struck the defendant's vehicle in the rear—not the left front side.
Curiously, when asked during cross-examination to explain the physical evidence of contact between the Durango and the defendant's vehicle, Bellizzi pointed to the apparent damage on the driver's side of the Infiniti, and a gouge on the passenger side of the Durango. Such damage, however, would seem, if anything, to be consistent with the defendant's recitation of how the accident happened.
Critically, the defendant testified that, after changing lanes and passing a vehicle driven by Carly Rahal, he came up next to the Durango, intending to pass that vehicle. The Toyota was ahead of him, but traveling at a slower speed than him. He accelerated to switch from the right lane to the left lane, and as he was straddling both lanes, he felt an impact on the front left corner of his vehicle. Thus, consistent with the testimony of the People's witnesses and inconsistent with the opinion of his own expert, the defendant testified that the accident occurred while he was straddling the two lanes.
Rahal observed in her rear view mirror the headlights from the defendant's vehicle, and testified that she saw the "car speeding up towards me" and heard the acceleration of the vehicle's engine. She testified that the defendant's vehicle attempted to pass the Durango, but that there "wasn't as much space between" the Durango and the Toyota as there had been when an earlier vehicle had passed, and that there was "definitely not enough room for safe passing over to the left lane."
Consistent with Rahal's testimony, Matthew Hochman, a passenger in the rear seat of the Durango, also heard the defendant's vehicle accelerating prior to impact, and described it as "a loud engine noise." Hochman testified that, prior to the defendant's vehicle striking the Toyota, it "split in between [the Durango and the Toyota] going very fast." Hochman further testified that, at that time, the Durango and the Toyota "were in a space where a car would not fit between them."
Eric Kaplan, the front seat passenger in the Durango, also testified that the defendant's vehicle was speeding, indicating that it was "coming at high speeds." He estimated that when the defendant's vehicle attempted to change lanes, there was only approximately four feet of distance between the Toyota and the Durango, which was essentially consistent with the testimony of Rahal and Hochman that there was not enough room for the defendant's vehicle to pass between the Toyota and the Durango.
Brian Shure, the other rear seat passenger in the Durango, testified that the defendant's vehicle "came speeding," that it "seemed to be going a lot faster than the car that previously sped by us," and that "it was going pretty fast." Shure observed that, just prior to the accident, the defendant's vehicle was "trying to go around us," and the Toyota was "maybe about one car length ahead of us." Crucially, when asked if there was enough room for another vehicle to pass in between the Durango and the Toyota, Shure indicated, "[t]here was not."
Marie Geffrard, the driver of the Toyota, testified "I heard a loud car coming . . . [t]hen all of a sudden I got hit." Geffrard described the defendant's vehicle as "the car who tried to get cross between the two cars. . . .[T]he car come from the back, tried to get in between the other car and mine." She further described the defendant's vehicle as "the car who tried to come over me, who tried to pass through between the other car and I." When asked by defense counsel if the defendant's vehicle was "[i]n the middle of the roadway, half of that car in the left lane, half of that car in the right lane," Geffrard responded, "[y]es."
Like Rahal and Hochman, DiNuzzo, the driver of the Durango, heard the defendant's vehicle accelerating, and then saw the defendant's vehicle "trying to pass myself or split, if you will, myself in the left lane and the [Toyota] in the right." He indicated that "it happened so quickly, I heard the [defendant's vehicle], and by the time I even turned my head slightly to the right the [defendant's vehicle] was already visible through my windshield." Upon seeing the defendant's vehicle, DiNuzzo decelerated, because "there was just no room. It's a two lane highway. And the [Toyota] just ahead of me in the right lane and myself being in the left staggered, there was clearly not enough room to pass." DiNuzzo repeatedly stated during his testimony, as did the other witnesses, that there was not enough room for the defendant's vehicle to pass when it was changing lanes.
The totality of the testimony of these six eyewitnesses consistently established that the defendant caused this accident when, while driving his vehicle at an excessive rate of speed, he dangerously attempted to change lanes and pass the Toyota and the Durango at a point when there [*9]was not enough room, and it was unsafe to do so. However, in addition to these six eyewitness accounts, the People also presented the testimony of two expert witnesses who determined that the physical evidence corroborated the eyewitnesses' accounts of the accident.
Daniel Smith, an Investigator with the New York State Police who was assigned to the Collision Reconstruction Unit, opined that the accident occurred when the defendant's vehicle "squeezed in between" the Durango and the Toyota, causing it to strike both vehicles, although he described the collision between the Infiniti and the Durango as a "slight impact." Smith testified that the air bag control module on the defendant's Infiniti was damaged and therefore a speed reading could not be obtained, however, he calculated the speed loss of the vehicle by looking at the tire and furrow marks it left behind, and the distance that it traveled both before and after it struck a tree. He determined that the speed loss of the Infiniti was 66 miles per hour. This calculation, however, did not include the energy the vehicle lost by striking the tree. Smith explained that the Infiniti had to be traveling much faster than 66 miles per hour, and indicated that "if the vehicle was traveling at 60 miles an hour over the length of the tire marks on the grass and came to the tree, the vehicle would have stopped. But the vehicle was traveling at a much [higher] speed, because it went to the tree, split the vehicle in half and continued to travel." Based on the physical evidence, Smith opined that the factors which contributed to the accident were "[u]nsafe lane change and an unsafe speed."
Kevin Tully, an accredited accident reconstructionist called as a witness by the People, opined that, just prior to the accident, the three vehicles were essentially abreast of each other, and the Infiniti was in the middle of the other two vehicles and straddling the two lanes of the parkway. He agreed with Smith's speed loss calculations for the defendant's vehicle. He also indicated that there were 401 feet of tire furrow marks in the grassy area of the median. Using the various speed loss calculations he determined that the Infiniti entered the grass at approximately 75 miles per hour. He then explained that, prior to departing the roadway and entering the grassy median, the Infiniti left approximately 112 feet of friction tire marks in the roadway, which dissipated additional speed from the vehicle. During the collision with the Toyota the speed loss was approximately four miles per hour, and therefore Tully calculated that, at the start of the collision, the Infiniti was traveling at a minimum of 92 miles per hour. Tully testified that he determined this speed in part based upon data retrieved from the Toyota which indicated that the vehicle sustained a change in velocity of 3.7 miles per hour, the weights of the vehicles, the length of the tire tracks, the distance of the furrows through the grass, speed loss calculations, the damage sustained by the vehicles, and crash test data from vehicles that were similar to the Infiniti driven by the defendant.
Tully described the extraordinary damage sustained by the Infiniti and indicated that "[t]he crush intrusion was massive and ultimately the force was exceeded to the point where the car actually tore into two pieces." When the vehicle split in half there was a dissipation of energy by the "significant crush and tearing" of the vehicle. Crucially, Tully indicated that the two halves of the vehicle separated and left the tree at a speed of approximately 20 miles per hour. When considering that this was after the vehicle had skidded more than 100 feet on the roadway, traveled more than 400 feet on the grassy median, and impacted the tree—shearing the metal and tearing the vehicle in two pieces—it is clear that the weight of the physical evidence indeed supports the 92 miles per hour speed estimation that Tully opined the defendant's vehicle was traveling at the time of the accident.
We do not believe, as do our colleagues in the majority, that Tully's opinion is discredited by his belief that there was no contact between the defendant's vehicle and the Durango. Tully's opinion in that regard was not fundamentally at odds with Smith's view that the contact between the Durango and the Infiniti was slight compared to the much heavier impact between the Infiniti and the Toyota. Moreover, Tully's opinion was supported by the physical evidence, which showed little damage to the Durango.
In any event, regardless of whether there was an impact between the Durango and the Infiniti, the opinions of Smith and Tully as to what caused the accident were indeed consistent with each other, as well as the accounts of the several eyewitnesses: the accident resulted from the combination of the defendant driving at an excessive and unsafe speed, coupled with his dangerous [*10]and unsafe lane change.
Moreover, the evidence provided by the medical examiner who performed the autopsy on Goings, although minimized by the majority, also supports the theory that the defendant's vehicle was traveling at a high rate of speed when the accident occurred. Laura Seijo Carbone, the Chief Medical Examiner of the Rockland County Medical Examiner's Office, testified regarding the findings from the autopsy performed on Goings. The cause of death was determined to be "multiple blunt force impact injuries of [the] head, torso and extremities with skeletal fractures, organ lacerations and hemorrhage" resulting from the collisions. Carbone described the injuries as "high velocity injuries" typically sustained in motor vehicle accidents occurring at speeds of over 50 miles per hour. She identified that the victim had multiple fractures of very dense bones—including the femur, the pelvis, and the spine in the lower back—and that these bones required tremendous force to fracture. She indicated that the victim's brain was torn at two points, and indicated this was a "rapid-deceleration" or high-impact injury. Additionally, the autopsy revealed a "straight-across tear" of the esophagus. Carbone explained that the esophagus is very elastic and resilient in nature, and requires tremendous force to achieve such a tear. Indeed, she had only seen injuries like this in cases of very high-velocity impact collisions. These catastrophic injuries sustained by Goings, coupled with the extraordinary physical damage to the defendant's vehicle, clearly demonstrate that the Infiniti was still traveling at a very high rate of speed when it hit the tree—after having skidded more than 100 feet on the roadway and traveled more than 400 feet on the grassy median.
Both the weight of the physical evidence and eyewitness testimony established that the defendant was operating his vehicle at an excessive rate of speed, and most importantly, that he attempted to change lanes by dangerously going in between the Toyota and the Durango when there was not enough room for a vehicle to pass. This attempted maneuver by the defendant was risk-creating behavior which transformed his speeding into dangerous speeding (see People v Cabrera, 10 NY3d 370, 377; People v Boutin, 75 NY2d 692, 696), and the weight of the credible evidence established beyond a reasonable doubt that the defendant failed to perceive a substantial and unjustifiable risk, which caused the death of Goings.
Upon our review of the weight of the evidence, we find that the County Court correctly weighed the evidence when it convicted the defendant of criminally negligent homicide. Accordingly, we vote to affirm the judgment of conviction.
ENTER:
Aprilanne Agostino
Clerk of the Court